```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA


ESTATE OF ELMER R. POSSINGER,  :   CIVIL ACTION
et al.                         :
                               :
          v.                   :
                               :
UNITED STATES OF AMERICA       :   NO. 06-4994
```

MEMORANDUM AND ORDER

McLaughlin, J.                                          July 11, 2008

      This is a wrongful death case filed by the estate and survivors of Elmer R. Possinger against the United States Government. Mr. Possinger owned a company that did construction and landscaping work. His company was hired by the National Park Service to remove debris from the Delaware Water Gap National Recreational Area. Mr. Possinger was killed when a fallen tree, which he was trying to remove from the roof of a spring house, struck the cab of his crane.

      The Court held a bench trial on March 31, April 1, and April 2, 2008. Following are the Court's findings of fact and conclusions of law. The Court finds in favor of the defendant.

I.    Findings of Fact

      1.    E.F. Possinger and Sons is a company in the business of excavating, paving, site demolition, site cleanup and landscaping. It submitted a proposal and then signed a contract

with the National Park Service to perform several jobs at the Delaware Water Gap National Recreation Area ("park" or "Delaware Water Gap").  The contract, Requisition/Reference Number R4320050076, was entered on May 12, 2005.  Both the proposal and the contract required, among other tasks, that the company remove a fallen tree from the roof of a spring house.

       2.   Elmer Roy Possinger was the President of E.F. Possinger and Sons and was skilled in all of the work that his company did, including being a skilled crane operator.  Mr. Possinger signed the contract with the Park Service.

       3.   On May 24, 2005, as part of this contract, Roy Possinger and Charles Praetorius, his helper, were working at Dingman's Ferry (in another section of the park) using a crane to clean a stream of flood damage.

       4.   When that job was completed, Mr. Praetorius drove the crane to the spring house, and Roy Possinger drove his pick-up truck to the site.  They intended to remove the fallen tree from the roof of the spring house, as required under the contract.

       5.   On the way to the site, Mr. Possinger stopped at the office of the Motor Vehicle Operator Supervisor at the park, Mr. Geis.  Mr. Possinger requested a chain saw from Mr. Geis because he did not have one with him and would need it to cut the tree.

6. Because it was the Park Service's policy not to lend out their equipment to contractors or to private individuals, Mr. Geis said he could not lend Mr. Possinger a chain saw but told Mr. Possinger that he might be able to help him out by sending some men to do whatever cutting was needed. Mr. Geis asked Mr. Degnan, the Facilities Manager, if he had anyone available to work overtime.

7. Mr. Degnan asked John Stead and James Slater if they could work overtime to assist Mr. Possinger. They agreed to do so. Mr. Degnan told them to see Mr. Geis about the work.

8. John Stead, along with James Slater, went into Mr. Geis' office and saw Mr. Possinger talking with Mr. Geis who said: "I want you to go help Mr. Possinger." Mr. Geis told them to go down to the spring house to "buck the tree up" after it was on the ground. To "buck a tree up" means to cut it up into smaller pieces.

9. When Mr. Praetorius got the crane to the site, and got the crane adjusted the way Mr. Possinger wanted it, he got out of the cab.

10. Mr. Possinger got into the cab of the crane, and Roy Possinger and Charles Praetorius set up the pads of the crane to stabilize the crane.

11. Mr. Possinger then lowered the cable of the crane and told Charles Praetorius to take the hook at the end of the

cable and attach it to the fallen tree.  Mr. Praetorius wrapped the cable around the tree, trying to get it in the middle of the tree.  He checked with Mr. Possinger who confirmed that the cable was placed properly around the tree.

      12.  Mr. Possinger then lifted the tree off the spring house and tried to set it on the ground.  He did this more than once.  He was not able to move the tree to the ground.

      13.  Mr. Possinger then told Mr. Stead that he could not move the tree because it was still attached to the root ball.  Mr. Possinger asked Mr. Stead to cut the tree from the root ball.  Mr. Stead asked Mr. Possinger if there was any tension on the cable.  Mr. Possinger said, "no, there's no tension on the cable."  Mr. Stead looked at the cable and it was slack, so he believed what Mr. Possinger said.

      14.  Mr. Stead put on his personal protection equipment and walked up to the tree.  He made cuts in various parts of the tree and before he made the final cut, he looked at Mr. Possinger and with a motion of his head, indicated to Mr. Possinger that he was about to make the final cut on the tree.

      15.  Mr. Possinger was aware that the Park Service employees were cutting the tree from the root ball because it was right in front of him and because he was looking in their direction.

16. Immediately after Mr. Stead finished cutting the tree from the root ball, the end of the tree nearest the cut fell toward the ground, then the tree rose up and swung forward and into the crane.

17. The tree crashed through the front window of the cab and hit Mr. Possinger who was standing in the cab.

18. Mr. Possinger fell from the cab to the ground and was subsequently pronounced dead.

19. Mr. Possinger was unconscious either immediately upon being hit by the tree, or almost immediately.

20. There is no evidence that Mr. Possinger experienced any conscious pain or suffering before or after the accident.

21. At the time of the incident, Mr. Geis was the contracting officers' technical representative ("COTR") for the contract between E. F. Possinger and Sons and the Park Service. It was his job to prepare the daily logs of construction. He decided that a contract was needed because the Park Service did not have the equipment to remove the tree from the spring house.

22. As the COTR, Mr. Geis was not allowed to terminate the contract. Nor was he required to be on site whenever work was being done. As a COTR, Mr. Geis usually went once a day to a job site to be sure that the job was being performed according to the specifications of the contract. Mr. Geis is not in control

of the site when he is the COTR.  The contractor is in control of the site.

      23.  The only way the tree could have crashed into the cab of the crane after it was cut from the root ball was because Mr. Possinger did not have sufficient slack in the cable which came from the crane arm and was attached to the tree.  There was insufficient slack in that cable because either:

      a.  At the time that the tree was cut from its root ball, Mr. Possinger did not have the wire hanging directly above the sling attached to the tree, but rather had it angled to the front and to the right; and/or

      b.  Mr. Possinger moved the crane arm immediately after the tree was cut.

## II. Conclusions of Law

      Plaintiff's brought this lawsuit under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq.[1]  The Federal Tort Claims Act provides that, "the United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."  28 U.S.C. § 2674.  In this

---

[1] In accordance with 28 U.S.C. § 2679, only the United States of America is a proper defendant in this matter.  The Department of Interior, National Park Service and Delaware Water Gap were dismissed with prejudice.

case, the liability of the United States and the amount of damages and the manner in which they can be collected is governed by the law of Pennsylvania, where the accident occurred.

The Court applies the following legal principles in reaching its decision.  Under Pennsylvania law, a landowner owes no duty to protect an independent contractor or the contractor's employees "from risks arising from or intimately connected with defects or hazards which the contractor has undertaken to repair," if the landowner has relinquished control of its land to the contractor.  Celender v. Allegheny Cty. San. Auth., 222 A.2d 461, 463-64 (Pa. Super. Ct. 1966).  A landowner also owes no duty to protect an independent contractor to whom it has delivered temporary possession of its land from "obviously dangerous conditions" on that land.  Hader v. Coplay Cement Manuf. Co., 189 F.2d 271, 277 (Pa. 1963); see also Fisher v. U.S., 441 F.2d 1288, 1292 (3d Cir. 1971); Brletich v. U.S. Steel Corp., 285 A.2d 133, 136 (Pa. 1971).

The application of these doctrines depends on the landowner being "out of possession and without control over the work or the premises."  Hader, 189 F.2d at 151.  Where a landowner entrusts work to an independent contractor, but "retains the control over any part of the work," it "is subject to liability for physical harm to others . . . caused by his

failure to exercise his control with reasonable care." Rest. 2d Torts § 414 (cited in Celender, 222 A.2d at 463).

Pennsylvania has adopted the comparative negligence statute which provides at 42 Pa. Cons. Stat. Ann. § 7102:

> In all actions brought to recover damages for negligence resulting in death or injury to persons or property, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the causal negligence of the defendant or defendants against whom recovery is sought, but any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

Thus, in this case, if the negligence of Mr. Possinger is greater than the negligence, if any, of the Park Service, the plaintiff cannot recover any damages. See Lawless v. Central Engineering Co., 502 F. Supp. 308, 310 (E.D.Pa. 1980) ("plaintiff is still barred from recovering if defendants are less negligent than he"); Edler v. Orluck, 515 A.2d 517, 525 (Pa. 1986) ("recovery by an injured plaintiff will be precluded . . . when a plaintiff's negligence exceeds the combined negligence of all defendants"); Terwilliger v. Kitchen, 781 A.2d 1201, 1209 (Pa. Super. Ct. 2001) (same).[2]

---

[2] The defendant also argues that the borrowed servant doctrine insulates it from liability here. "A person who is employed generally by one employer but is performing a particular service for another employer under the control and direction of the temporary employer becomes the borrowed servant of that

The Court decides for the defendant on the ground that even if Mr. Stead and/or Mr. Slater was negligent, they were much less negligent than Mr. Possinger. This was a crane lifting operation. Mr. Possinger was in control of the operation. It was his obligation to maintain enough slack in the cable so that when the fallen tree was cut at the root ball, it would stay on the ground. It was also his obligation to make sure the cable was directly over the load. He did neither of these things.

The Court heard from two opinion witnesses during the trial: George Widas for the plaintiff and Richard Daniels for the defendant. The Court found Mr. Daniels much more persuasive and credible than Mr. Widas. Mr. Daniels had better qualifications -- a masters degree in engineering. His opinions were also much more logical and sensible than those of Mr. Widas.

Both witnesses discussed the obligations of a crane operator during a lifting operation, referring to certain standards that govern crane operation. For example, both discussed the standards of the American National Standards Institute ("ANSI"), an organization that publishes consensus

---

temporary employer." Tidewater Grain Co. v. SS Point Manatee, 614 Supp. 29, 31 (E.D. Pa. 1984); see also Standard Oil Co. v. Anderson, 212 U.S. 215, 221 (1909). Under the borrowed servant doctrine, the temporary employer is vicariously liable for the negligence of the borrowed servant. Id. The Court does not need to decide the applicability of this doctrine and will not do so.

standards that are generally accepted by engineers.  The ANSI standard at issue in this case is a crane operation standard.  ANSI standard B30.5-1968 §5-3.1.3.d states:  "The operator [of the crane] shall be responsible for those operations under his direct control.  Whenever there is any doubt as to safety, the operator shall have the authority to stop and refuse to handle loads until safety has been assured."

There is an Occupational Safety and Health Administration("OSHA") standard that requires that the hook of a crane's cable be directly over the spot where it is choked: "Before starting to hoist, the following conditions shall be noted: . . . (c) The hook shall be brought over the load in such a manner as to prevent swinging."  29 C.F.R. §1910.180(H)(3)(ii).  When tension is placed in the lifting system, if the hook is not directly over the load and the hook is directly under the tip of the boom, the load will swing.  A free swinging load will move in a pendulum fashion until it is directly under the tip of the boom.  At that point, it will be directly under the hook.  There is another OSHA regulation that says: "During hoisting care shall be taken that: (a) There is no sudden acceleration or deceleration of the moving load."  29 C.F.R. §1910.179(n)(3)(iii).

According to Mr. Widas, the safety of the lifting operation is the responsibility of the crane operator, but a

lifting operation is only in process when the crane operator is actually lifting the object.  Mr. Widas seemed to be suggesting that the crane operator is responsible for his load only when he is actually lifting it, but not when the crane's cable is attached to the load before it is lifted.  According to Mr. Widas, Mr. Possinger was, therefore, not conducting a lifting operating when he was sitting in the crane with the cable hooked around the tree.  Mr. Daniels opined that the lifting operation began when Mr. Praetorius attached the hook to the tree and did not end until after the tree was on the ground.  The lifting operation continued while the tree was being cut.  That opinion is much more consistent with the standards that were cited to the Court and is much more logical and persuasive.

  The only possible negligence of the government employees was that they went forward and cut the tree at Mr. Possinger's request.  Even if their agreement to be of help to Mr. Possinger was negligent, that negligence pales in comparison with the crane operator's negligence.  The plaintiff argued that they should have (1) refused to cut the tree, or (2) cut the tree in a manner that did not take up all the slack or (3) restrained the tree in some way.  But there was no evidence that cutting the tree in a different way would have changed the result, and the crane operator was in charge of the operation.  It was the crane

operator's responsibility to make sure that his load did not swing.

       An appropriate Order follows.

```
             IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA


ESTATE OF ELMER R. POSSINGER, :    CIVIL ACTION
et al.                        :
                              :
          v.                  :
                              :
UNITED STATES OF AMERICA      :    NO. 06-4994
```

ORDER

AND NOW, this 11th day of July, 2008, upon consideration of the plaintiffs' proposed findings of facts (Docket No. 45), the defendants' proposed findings of facts (Docket No. 44), and after a non-jury civil trial commencing on March 31, 2008, IT IS HEREBY ORDERED that for the reasons stated in a memorandum of today's date, judgment is entered for the defendant and against the plaintiffs.

This case is closed.

```
                         BY THE COURT:


                         /s/ Mary A. McLaughlin_____
                         MARY A. McLAUGHLIN, J.
```